E-FILED
Friday, 12 April, 2019 12:55:12 PM
Clerk, U.S. District Court, ILCD

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF ILLINOIS

3

4

   UNITED STATES OF AMERICA,      )
5                                 )
              Plaintiff,          )
6                                 )   Criminal No. 2:18-20004
         vs.                      )
7                                 )
   DEWAYNE YOUNG,                 )
8                                 )
              Defendant.          )
9

10                   TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE SARA DARROW
11                     *FRANKS* HEARING
               APRIL 9, 2019; 2:28 P.M.
12                   URBANA, ILLINOIS

13

   APPEARANCES:
14

   For the Government:      RACHEL E. RITZER, ESQUIRE
15                          EUGENE L. MILLER, ESQUIRE
                           Asst. United States Attorneys
16                          201 South Vine Street
                           Urbana, Illinois 61802
17                          (217) 373-5875

18 For the Defendant:       STEPHEN F. HALL, ESQUIRE
                           Law Office of Stephen F. Hall
19                          53 W. Jackson Blvd., Suite 1437
                           Chicago, Illinois 60604
20                          (312) 858-4400

21

22

23          Jennifer E. Johnson, CSR, RMR, CRR
                U.S. District Court Reporter
24               Central District of Illinois

25 Proceedings recorded by mechanical stenography;
   transcript produced by computer

1                            INDEX

                                              PAGE
2

3   WITNESSES FOR THE GOVERNMENT:

4     JASON HESSE

5          Direct Examination                 5
           Cross-Examination                 36
6          Examination by the Court          55

7     ELIZABETH PFOHL

8          Direct Examination                57
           Cross-Examination                65
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings held in open court.)

2        THE COURT:  All right.  This is the case of

3   the *United States of America vs. Dewayne Young*,

4   Case Number 18-20004.  Appearing on behalf of the

5   government is AUSA Ritzer, and at some point we

6   expect Mr. Miller also to join us.  Appearing in

7   open court is the defendant, Mr. Young, along with

8   his attorney, Mr. Hall.

9        This matter comes before me this afternoon for

10  the evidentiary hearing regarding the *Franks* -- the

11  request for a *Franks* hearing.

12       Miss Ritzer, anything on behalf of the

13  government before we proceed?

14       MS. RITZER:  Your Honor, the government's

15  prepared to proceed with the *Franks* hearing.

16       THE COURT:  Okay.  Thank you.

17       Mr. Hall?

18       MR. HALL:  Just briefly, Your Honor.  We had

19  anticipated that Special Agent Edson would also be

20  here today to testify.  I was notified on Friday --

21  a few days ago -- that he is on vacation today.

22  And so I discussed with the government the idea of

23  going ahead and having the hearing today with our

24  two -- with their two witnesses that are present

25  and then possibly discussing with Your Honor

1  continuing for a second court date the appearance

2  of Special Agent Edson.

3       So, I just wanted to go ahead and put that in

4  front of Your Honor so you're not surprised.

5       THE COURT:  Who are your two witnesses today?

6       MS. RITZER:  Your Honor, we have Detective

7  Hesse -- Jason Hesse -- with the Decatur Police

8  Department, who was the affiant officer in this

9  affidavit that's before this Court, as well as the

10  Assistant State's Attorney Elizabeth Pfohl who

11  reviewed the affidavit prior to it being signed at

12  the state court.

13       It's the government's position and expectation

14  that at the conclusion of their testimony that it

15  will be clear that Agent Edson does not have

16  relevant testimony to the issues before the Court

17  for this particular *Franks* hearing.

18       And so that's sort of -- but the parties are

19  sort of in agreement that that's a determination

20  that would certainly be made by this Court at the

21  conclusion of those testimonies.

22       THE COURT:  Okay.  Thank you.

23       And the defendant's motion for leave to file a

24  reply is granted.

25       MR. HALL:  Thank you, Your Honor.  I'll have

1  that on file later today or tomorrow.

2       Other than that, we are prepared to proceed.

3       THE COURT:  All right.  You may proceed.

4       MR. HALL:  We've had an agreement with the

5  government, they are going to be producing the

6  witnesses, and I'll be cross-examining.

7       THE COURT:  Okay.

8       MS. RITZER:  With agreement of the Court, of

9  course, Your Honor.

10       THE COURT:  All right.  Thank you.  That's

11  fine.  You may proceed.

12       MS. RITZER:  Thank you, Your Honor.

13       At this point, the government will call

14  Detective Jason Hesse to the stand.

15       Does the Court have a preference if I speak

16  from the podium or from counsel table?

17       THE COURT:  No, as long as I can hear you.

18  Thank you.

19       MS. RITZER:  Certainly.

20       **(Witness sworn by the clerk.)**

21                         **JASON HESSE,**

22  **called as a witness, was examined and testified**

23  **upon his oath as follows:**

24                    **DIRECT EXAMINATION**

25  BY MS. RITZER:

1   Q.   Good afternoon, Detective.

2        Could you please state your name and spell

3   your last name for Madam Court Reporter?

4   A.   Jason Hesse, H-e-s-s-e.

5   Q.   And how are you employed, sir?

6   A.   I'm a police officer with the City of Decatur.

7   Q.   Okay.  And specifically within your role as a

8   police officer, do you have a specific assignment

9   within the Department?

10  A.   Yes, I do.

11  Q.   And what is that?

12  A.   I'm a detective within the Street Crimes Unit.

13  Q.   Okay.  And the Street Crimes Unit, what

14  specifically do they investigate?

15  A.   Primarily narcotics offenses.

16  Q.   Okay.  And how long have you been employed

17  with the Decatur Police Department?

18  A.   Since February of 2005.

19  Q.   And how long have you been a detective with

20  that Department?

21  A.   Approximately February 2009.

22  Q.   Do you currently have any other employment or

23  any other roles within your position?

24  A.   Yes, I do.

25  Q.   And what is that?

1  A.   Task force officer with the Drug Enforcement
2  Administration.
3  Q.   How long have you been a task force officer
4  with D.E.A.?
5  A.   Since March of 2017.
6  Q.   I would like you to describe a little bit of
7  your educational background.
8       Did you attend college?
9  A.   Yes, I did.
10  Q.   And where did you attend?
11  A.   Western Illinois University.
12  Q.   Did you receive a degree from Western?
13  A.   Yeah, bachelor's in criminal justice.
14  Q.   And can you please describe your training that
15  you received upon your employment at Decatur Police
16  Department?
17  A.   I attended the Police Training Institute at
18  the University of Illinois.
19  Q.   And briefly can you describe what that program
20  involves?
21  A.   It's roughly a three-month program that goes
22  into criminal law, the proper ways to conduct a
23  traffic stop for a rookie officer, and general
24  investigative techniques that will be needed as a
25  police officer.

1  Q.   And did you successfully complete that
2  program?
3  A.   Yes, I did.
4  Q.   Once you completed that program and began as a
5  patrol officer with DPD, have you continued to
6  obtain further continuing education throughout your
7  career?
8  A.   Yes.
9  Q.   And can you describe what that continuing
10  education involves?
11  A.   Now our department sends out -- they're called
12  monthly training questions.   They can be anywhere
13  from recent -- questions on recent law updates or
14  changes in the policies.
15  Q.   So, you continue to educate yourself through
16  the department on, on changes in the law and
17  changes in how you are supposed to operate as a
18  police officer.   Is that accurate to say?
19  A.   That's correct.
20  Q.   Now, you had indicated you joined DPD back in
21  2005.   What did you -- what was your original
22  position within DPD?
23  A.   Patrol officer.
24  Q.   And you were promoted to detective in 2009.
25  Is that accurate?

1  A.   That's correct.

2  Q.   Once you were a detective, were you

3  immediately assigned to Street Crimes Unit?

4  A.   Yes, I was.

5  Q.   And when did you receive your assignment to be

6  a task force officer?

7  A.   It was approximately March of 2017.

8  Q.   And how many D.E.A. task force officer

9  positions are there in Macon County, to your

10  knowledge?

11  A.   One.

12  Q.   Just you?

13  A.   That's correct.

14  Q.   Now, would you please walk us through what the

15  application process is for -- to become a task

16  force officer for D.E.A.?

17  A.   We were advised there was going to be an

18  opening as a task force officer with D.E.A.  Our

19  commander came to us, and we had to submit a --

20  what we call a bulletin through our chain of

21  command for anybody who was interested.  From

22  there, our command chose who the task force officer

23  would be.  And then once we got that position, then

24  we also had another background check and interview

25  with the D.E.A.

1    Q.   Do you know approximately how many DPD

2    officers applied for the position when you applied?

3    A.   To my knowledge, it was just open within the

4    Street Crimes --

5         MR. HALL:   Objection, relevance.

6         THE COURT:   What is the relevance?

7         MS. RITZER:   Your Honor, it goes to the

8    credibility and establishes the education and

9    background checks that this officer has

10   particularly gone through throughout his career.

11        MR. HALL:   Respectfully, Your Honor, I don't

12   think there's any relevance in his -- the

13   background checks he underwent to become a D.E.A.

14   task force officer pertinent to what we're dealing

15   with today.

16        THE COURT:   Yes, I mean, I would wrap it up

17   here.

18        MS. RITZER:   Certainly, Your Honor.

19        THE COURT:   I don't need all the details.

20   Thank you.

21        MS. RITZER:   I'll move along, Your Honor.

22   Thank you.

23   BY MS. RITZER:

24   Q.   Detective Hesse, can you estimate for the

25   Court the number of drug investigations that you've

1    been involved in as a law enforcement officer?

2    A.   If we're counting just routine traffic stops

3    all the way to, you know, investigative work, it

4    would be well into the several hundreds.

5    Q.   Now, when you are conducting narcotics

6    investigations generally, do you and your

7    investigative teams regularly utilize confidential

8    sources in those investigations?

9    A.   Yes, we do.

10   Q.   And how do individuals become confidential

11   sources -- or CSs -- for DPD?

12   A.   They would be basically someone who would be

13   working in consideration of their own charges that

14   may be pending or already charged or someone

15   working for money.

16   Q.   Okay.  And are there any common

17   characteristics, through your training and

18   experience, that you've come to recognize in

19   confidential sources used by DPD?

20   A.   Yes.

21   Q.   And what are those characteristics?

22   A.   They're seeking, like I stated, some sort of

23   compensation, whether it's toward charges or money.

24   They have criminal histories, and they're either

25   users or sellers of narcotics.

1  Q.  Now, this likely seems an obvious answer, but

2  why are informants kept confidential?

3  A.  For their safety and as well as their

4  families' safety.

5       (AUSA Miller entered the courtroom.)

6  Q.  Does each source work with one investigator or

7  one officer in DPD, or do they generally work with

8  several officers at once?

9  A.  Typically they would just work with one, one

10 officer.

11 Q.  And when a CS is working with DPD, are there

12 any agreements or promises made to them if, for

13 example, they're working in consideration for cases

14 or an arrest?

15 A.  No.

16 Q.  Are there any promises that are made to them

17 when they are working for payments?

18 A.  No, not as far as any amounts or anything like

19 that.

20 Q.  Are there any requirements as far as when an

21 individual would be paid for a tip, for

22 information?

23 A.  The tip would have to be an accurate tip.

24 Q.  Otherwise, they aren't paid?

25 A.  Correct.

1  Q.  Now, you indicated that there was no agreement

2  as to the tip amount.  Why might there be a

3  variance in the amount of tip money that an

4  individual would receive?

5  A.  It could depend on a variety of things -- what

6  was seized from the house, an example, whether

7  there was guns involved, the amount of drugs

8  seized, the number of arrests, and also could go

9  into how much the CS was, I guess, put out there,

10  for lack of a better term.  I guess the risk toward

11  the CS.

12  Q.  In your over a decade with the detectives

13  bureau, what would you say is the average range of

14  tips that CSs receive?

15  A.  Anywhere from probably 100 to $500.

16  Q.  And who makes that determination as to the tip

17  amount?

18  A.  Usually it's whoever the CS's handler is, and

19  then it would be approved by a sergeant in our

20  unit.

21  Q.  Now, you indicated that a CS is only paid when

22  accurate information is given; is that correct?

23  A.  Yes.

24  Q.  Okay.  If a CS is shown to have provided false

25  or inaccurate information to their handler or to

1  another officer within DPD, besides them not

2  getting paid, are there any other consequences for

3  their actions?

4  A.   Yes.  If we know that they've provided false

5  or bad information, then that CS will not be

6  utilized anymore by us.

7  Q.   Okay.  And now, you indicated that

8  confidential sources are regularly used in drug

9  investigations.  Is that accurate?

10  A.   Yes.

11  Q.   Does that include to obtain search warrants?

12  A.   Yes.

13  Q.   Now, in general, who drafts an affidavit

14  that's drafted in support of a search warrant?

15  A.   The detective that's going to be the case

16  agent.

17  Q.   And do DPD detectives receive training in how

18  to draft affidavits?

19  A.   We receive training by other senior detectives

20  when we come to the unit as well as the sergeants

21  at the time would show us how they're doing search

22  warrants.

23  Q.   And did you complete that training?

24  A.   Yes, I was shown by them.

25  Q.   So, as part of your training and experience,

1  do you regularly rely on the sort of collective

2  knowledge of the detectives bureau within Decatur

3  Police Department when you're drafting these

4  warrants?

5  A.  Yes.

6  Q.  And do you follow the standard, accepted

7  practices of your Department?

8  A.  Yes.

9  Q.  Can you estimate for the Court the number of

10  search warrants that you've either drafted or

11  assisted in drafting during your employment with

12  DPD?

13  A.  Again, that would be well into the hundreds.

14  Q.  Now, in general, once an affidavit is drafted

15  by an officer, is it reviewed by any other person?

16  A.  Yes, it is.

17  Q.  And who reviews it?

18  A.  An assistant state's attorney or the state's

19  attorney himself.

20  Q.  And by an assistant state's attorney or the

21  state's attorney, what office would that be with?

22  A.  I'm sorry, the Macon County State's Attorney's

23  Office.

24  Q.  Now, are there multiple prosecutors who might

25  look at an affidavit?

1  A.  Yes.

2  Q.  How is that determined, which prosecutor you

3  show an affidavit to?

4  A.  They go on a weekly on-call schedule.  So,

5  whoever's on call that week would be who would

6  review it.

7  Q.  Once an officer or you have decided that

8  there's probable cause to request a warrant, do you

9  or other officers include every detail that's -- of

10  the investigation in that affidavit?

11  A.  No.

12  Q.  And why not?

13  A.  Again, for the CS's safety and to try to keep

14  the CS confidential.

15  Q.  Now, the information that might be left out,

16  does that include information that might be

17  beneficial to you or helpful to you in showing

18  probable cause?

19  A.  There is information such as that that's left

20  out, yes.

21  Q.  Would you leave out information that would

22  negate or hurt your chances of getting probable

23  cause?

24  A.  No, I would not.

25  Q.  In your experience with the Decatur Police

1   Department, what credibility information is

2   generally included in search warrants about the

3   confidential source that was used?

4   A.   We try to establish a pattern of that CS

5   providing information that was deemed to be

6   reliable.  Typically for a CS to be considered a

7   reliable informant, we go off of they've provided

8   information on at least three prior occasions, and

9   that information has been found to be reliable.

10  Q.   And when do -- sorry.

11       Do detectives bring the CS before a judge when

12  they are signing an affidavit for a search warrant?

13  A.   If it's a new CS, they will.  However, if it's

14  somebody who has a past track record of being

15  reliable for us, has worked for us for some time,

16  and has provided several reliable tips or

17  information in the past, we would not take them in

18  front of the judge.

19  Q.   Now, do Decatur Police Department detectives

20  generally include detailed information about a

21  CS's, for example, criminal history?

22  A.   No, we do not.

23  Q.   And why would that not be included?

24  A.   Again, to try to keep the CS confidential.

25  Q.   And is it general or common to include a CS's

1  relationship with the target of a warrant?

2  A.  No.

3  Q.  What about any pending cases that they might

4  have?

5  A.  No.

6  Q.  And would also -- generally is the motive --

7  motivation or what they're working for included in

8  an affidavit?

9  A.  No, it's not.

10  Q.  Now, we've been discussing sort of the general

11  practices of Decatur Police Department.  Do you

12  follow the same procedures that we've been

13  discussing so far?

14  A.  Yes.

15  Q.  Now, after an affidavit is approved by a

16  prosecutor, what happens next?

17  A.  The prosecutor arranges a time with the judge

18  and myself, and the prosecutor will present it to

19  the judge.

20  Q.  And, again, the same question as earlier:  How

21  do you determine or how does the prosecutor

22  determine which judge to present a warrant to?

23  A.  They go on the same weekly on-call schedule.

24  Q.  Now, when you present a warrant to be reviewed

25  or signed, you indicated that a couple people are

1  present.  Who specifically would be present during

2  that process?

3  A.   Be myself and the prosecutor.

4  Q.   Might a CS as well be present?

5  A.   They could be, yes.

6  Q.   Now, do judges have the ability then to ask

7  clarification questions about an affidavit?

8  A.   Yes.

9  Q.   In your experience, have you been asked for

10  additional information from a reviewing judge?

11  A.   Yes.

12  Q.   Now, I'm going to ask that you direct your

13  attention to specifically August of 2017.

14      You were employed with the Decatur Police

15  Department as a detective at that time; is that

16  accurate?

17  A.   That's correct.

18  Q.   And around that time, were you also involved

19  in an investigation into an individual by the name

20  of Dewayne Young?

21  A.   Yes, I was.

22  Q.   Will you please briefly describe how that

23  investigation began?

24  A.   Came through a CS tip.

25  Q.   Now, during this investigation into Mr. Young,

1  did you request a search warrant and obtain a

2  search warrant to search the suspect's residence?

3  A.   Yes, I did.

4       MS. RITZER:   Permission to approach the

5  witness, Your Honor?

6       THE COURT:   You may.

7  BY MS. RITZER:

8  Q.   I'm handing you what's been marked for

9  identification purposes as Government's Exhibit 2.

10      Can you take a look at that?

11 A.   Yes.

12 Q.   And do you recognize that?

13 A.   Yes, I do.

14 Q.   What do you recognize it to be?

15 A.   The search warrant that I typed.

16 Q.   And by the search warrant that you typed, can

17 you be more specific?

18 A.   The complaint for search warrant, the

19 affidavit that I signed.

20 Q.   In regards to the, the investigation into

21 Dewayne Young and his residence?

22 A.   Yes, I'm sorry, for Mr. Young.

23 Q.   And is that copy that's in your hand a true

24 and accurate copy of the warrant and the

25 application that you presented to the judge on

1  August 31st of 2017?

2  A.   Yes.

3       MS. RITZER:  At this point, Your Honor, we

4  would move to admit Government's Exhibit 2.  I have

5  an extra copy for the Court.

6       MR. HALL:  Without objection.

7       THE COURT:  It's admitted.

8  BY MS. RITZER:

9  Q.   Now, Detective, I'd like you to speak a little

10  bit about specifically the confidential source that

11  was involved in this particular investigation.

12       In preparing the affidavit, were you somewhat

13  familiar with this CS's background with the Decatur

14  Police Department?

15  A.   Yes, I was.

16  Q.   Approximately how long had this CS been

17  working with Decatur PD?

18  A.   Multiple years.

19  Q.   We've discussed that individuals sort of

20  become CSs through various methods.  Are you aware

21  -- at the time of this investigation, were you

22  aware, when drafting that affidavit, what this CS

23  was working in consideration for?

24  A.   I was aware this CS was working for payment.

25  Q.   And at the time, were you aware of whether he

1   or she had any pending criminal cases?

2   A.   No.

3   Q.   No, you were not aware or no, he didn't -- he

4   or she?

5   A.   He did not have any at that time.

6   Q.   Did he or she have any pending investigations

7   that he or she would have been working in

8   consideration for?

9   A.   No.

10   Q.   And was he or she under court supervision at

11   the time in some way, whether that was probation or

12   parole?

13   A.   No.

14   Q.   You previously described that there are sort

15   of rules that govern when a CS might be paid.  Is

16   that accurate?

17   A.   Yes.

18   Q.   Specifically that they have to be accurate

19   tips to be paid?

20   A.   Correct.

21   Q.   And that if a CS provides false information

22   that they are no longer allowed to be a CS.  Is

23   that also accurate?

24   A.   Yes, if they provide false information.

25   Q.   Based on your interactions with this

1  particular CS, is it your belief that this CS,

2  having been a years-long source with the

3  Department, was aware of those rules?

4  A.   Yes.

5  Q.   Now, prior to your testimony here today, did

6  you review the warrant and the affidavit that's in

7  Government's Exhibit 2?

8  A.   Yes.

9  Q.   Now, in reviewing this case, did you learn

10  whether a prosecutor had reviewed this affidavit?

11  A.   Yes, I did.

12  Q.   And do you know who that individual was?

13  A.   It was Elizabeth Pfohl.

14  Q.   Is she an assistant state's attorney with the

15  Macon County State's Attorney's Office?

16  A.   Yes, she is.

17  Q.   Now, in reviewing the warrant, were you also

18  reminded of which judge reviewed and authorized

19  this warrant?

20  A.   Yes.

21  Q.   And who was that?

22  A.   It was Judge Rodney Forbes.

23  Q.   Are you familiar with Judge Forbes from your

24  time with the Decatur Police Department?

25  A.   Yes.

1  Q.   And are you aware of approximately how long he

2  has been on the bench?

3       MR. HALL:   Objection, relevance.

4       THE COURT:   What is the relevance?

5       MS. RITZER:   Your Honor, I believe it goes to

6  the knowledge of this judge, to some extent, and

7  what information Detective Hesse felt was pertinent

8  to be included in the warrant.

9       THE COURT:   What does the knowledge of the

10  judge have to do with the focus of the hearing

11  under *Franks* and whether or not there was an

12  omission?

13       MS. RITZER:   I'm sorry, the -- I believe it

14  goes, to some extent, to the first prong of *Franks*

15  specifically, the materiality of the information

16  that was omitted.

17       MR. HALL:   Your Honor, if I may briefly

18  respond?  Based on the pleadings in this case, I

19  anticipate that Counsel's about to go into the

20  questions related to whether the judge that

21  approved this search warrant should have assumed or

22  had some sort of knowledge that more than likely or

23  probably this confidential source was working for

24  payment or might have been fighting a case.

25       Now, there's certainly no proof of that, and

1  there's certainly no requirement to show a

2  subjective intent or subjective knowledge on the

3  part of the judge as to materiality.  It's an

4  objective standard.

5       So, I think this is entirely irrelevant and

6  likely prejudicial.

7       THE COURT:  It is an objective standard,

8  correct?

9       MS. RITZER:  That is correct, Your Honor.

10       THE COURT:  So, what would be the relevance of

11  the judge's experience or any possible inference

12  you'd be asking me to draw based on that

13  experience?

14       MS. RITZER:  I believe it potentially goes to

15  the subjective intent of the officer, but I'm happy

16  to move along, Your Honor.

17       THE COURT:  Okay.  The objection is sustained.

18  BY MS. RITZER:

19  Q.  Now, Detective Hesse, can you look at the

20  Government's Exhibit 2 and review your signature on

21  that document?

22       And do you see your signature on that

23  document?

24  A.  Yes, I do.

25  Q.  And are there numbers located after that --

1   A.   Yes.

2   Q.   -- that signature?

3   A.   Yes.

4   Q.   What are those numbers?

5   A.   592.

6   Q.   And what do those numbers indicate to you?

7   A.   My ID number as a -- with the City of Decatur.

8   Q.   Is that your badge number with the police

9   department?

10  A.   Yes.

11  Q.   Okay.  Now, you mentioned that you have

12  essentially two roles -- that you have both a role

13  as a Decatur police detective as well as a D.E.A.

14  task force officer.  Is that accurate?

15  A.   That's correct.

16  Q.   Okay.  At the time that you drafted this

17  affidavit and requested that a judge review it,

18  what role were you operating within?

19  A.   As a Decatur detective.

20  Q.   Can you describe how you can tell that?

21  A.   Well, drafting a state search warrant, it was

22  basically a state investigation.

23  Q.   I'd like to now direct your attention to

24  specifically the investigation in this case.

25       Were you the lead detective in this

1  investigation?

2  A.  Yes.

3  Q.  And you indicated that this investigation

4  began with a tip from a confidential source.  Is

5  that accurate?

6  A.  That's correct.

7  Q.  Can you describe what information the CS

8  provided?

9  A.  The CS stated that he or she happened to be

10  present inside 1112 East Moore with the individual

11  he or she knew as "D."  That "D" was in possession

12  of a -- what he or she described as a distribution

13  amount of heroin and also that he or she knew "D"

14  to drive a gray Dodge Challenger.

15  Q.  And when you were first given that information

16  from the CS, what did you then do?

17  A.  I attempted to corroborate that, what the CS

18  said.

19  Q.  And what steps did you take to do that?

20  A.  I checked the City of Decatur water billing

21  and found that a water billing was in the name of a

22  Dewayne Young with a Wisconsin ID.  Found that

23  Mr. Young also had a silver or gray Dodge

24  Challenger registered in his name out of Wisconsin.

25  Q.  And did you attempt to confirm as well the

1   defendant's identity through observing photographs,

2   for example, on his ID card?

3   A.   Yes, I was able to locate a Wisconsin ID of

4   Mr. Young.

5   Q.   And did you conduct any -- I'm sorry.

6        At what point then did you decide to apply for

7   a search warrant?

8   A.   When I believed I had sufficient probable

9   cause to draft a search warrant and had

10  corroborated what the CS had told me.

11  Q.   And did you draft the affidavit in this case?

12  A.   Yes, I did.

13  Q.   When you were drafting the affidavit, what was

14  your intent as you were writing it?

15  A.   To establish sufficient probable cause for a

16  search warrant.

17  Q.   And what information did you believe was

18  relevant to the judge in his determination of the

19  probable cause?

20  A.   What the CS said and what I had corroborated

21  with the CS.

22  Q.   Did you provide the reviewing judge with any

23  information about the credibility of the CS?

24  A.   I did.

25  Q.   And what was that?

1   A.   I put in the affidavit that this CS had

2   provided information that would show to be reliable

3   on at least three prior occasions.

4   Q.   You've indicated a couple times now that it

5   was at least three prior occasions.  Did he or she

6   provide accurate information for more than three

7   investigations?

8   A.   Yes.

9   Q.   And why did you choose not to include the

10  specific number of investigations that this CS had

11  cooperated in?

12  A.   Again, just using the standard of three to

13  show that they had provided reliable information in

14  the past and, again, to keep the CS as confidential

15  as we can.

16  Q.   Now, at the time that you drafted this

17  affidavit, were you familiar with the CS's criminal

18  history?

19  A.   Yes, somewhat.

20  Q.   And were you aware at the time whether the

21  convictions were for any crimes of dishonesty?

22  A.   They were not.

23  Q.   At the time that you drafted this affidavit,

24  again, were you aware of whether the CS was under

25  supervision of the court?

1   A.   Yeah, he was not.

2   Q.   Are you currently aware of the specifics of

3   this CS's criminal history?

4   A.   Yes.

5   Q.   Can you please describe generally the CS's

6   criminal history?

7   A.   He has four -- four prior felonies and two

8   misdemeanors.

9   Q.   And were any of those prior convictions for a

10  crime of dishonesty?

11  A.   No, they were not.

12  Q.   And have you confirmed that at the time of his

13  or her involvement in this investigation that he or

14  she had no pending or ongoing investigations or

15  criminal cases?

16  A.   That's correct.   There was no pending cases.

17  Q.   And have you confirmed that he or she was not

18  under supervision of any court at the time that he

19  or she assisted in this investigation?

20  A.   That's correct.

21  Q.   You didn't include either the CS's criminal

22  history or the fact that he or she was expecting

23  payment in that affidavit.   Is that accurate?

24  A.   That's correct.

25  Q.   And why did you choose not to include this

1  information?

2  A.   That's based on how I was trained when I came

3  in.   That's how we were shown to do search

4  warrants.

5  Q.   Are there other -- is there other information

6  that you might -- that you chose not to include in

7  this affidavit?

8  A.   Yes, there is.

9  Q.   And what was that generally?

10  A.   What information would I generally not

11  include?   Is that what you're asking?

12  Q.   I'm sorry.   When you were drafting this

13  affidavit, in addition to the CS's criminal

14  history, were there additional details provided to

15  you by the CS that you chose not to include?

16  A.   Yes.

17  Q.   And were any of those details that you chose

18  not to include anything that would have suggested

19  or undercut the finding of probable cause in this

20  case?

21  A.   No.

22  Q.   It was additional information that would have

23  helped you in your finding of probable cause.   Is

24  that accurate?

25  A.   That's correct.

1  Q.   Why did you choose not to include that
2  information?
3  A.   Again, there's -- sometimes there's details
4  about the interior of a residence or what an
5  individual may be in possession of that we're not
6  quite sure how many people would know those
7  specific details, so it -- putting that in there
8  would lead us to give more probable cause for the
9  search warrant; however, to keep the CS
10 confidential, we chose to leave, leave some of
11 those details out.
12 Q.   You previously testified that ASA Pfohl --
13      And for the record -- I apologize, Madam Court
14 Reporter -- it's P-f-o-h-l.
15      -- ASA Pfohl had reviewed this affidavit prior
16 to you presenting it to a judge.  Is that accurate?
17 A.   That's correct.
18 Q.   To your recollection, did ASA Pfohl request
19 that you add any additional information into this
20 affidavit?
21 A.   No.
22 Q.   To your recollection, did she suggest you make
23 any changes to the affidavit at all?
24 A.   No.
25 Q.   Now, when Judge Forbes approved and signed the

1   search warrant, what date did he do that?

2   A.   August 31st, 2017.

3   Q.   And to your recollection, did Judge Forbes ask

4   you for any additional information?

5   A.   To my recollection, no.  But it's -- like I

6   said, it's been some time ago so I couldn't be

7   certain.

8   Q.   And once the warrant was signed, did you and

9   your team execute it?

10  A.   Yes, we did.

11  Q.   Okay.  What date did you execute it?

12  A.   September 1st.

13  Q.   Are you familiar with the charges in the

14  present case?

15  A.   Yes.

16  Q.   And is it accurate to say that the defendant

17  is currently charged with possessing both cocaine

18  and cocaine base or crack cocaine?

19  A.   Yes.

20  Q.   Is it also accurate that in the affidavit this

21  CS had stated that he observed heroin in the

22  residence?

23  A.   That's correct.

24  Q.   Can you describe that -- or explain that

25  discrepancy to the Court?

1   A.   Yes.   When we first executed the search
2   warrant, I was actually met in the front yard by a
3   sergeant with the Emergency Response Team.   He's
4   also been in the Street Crimes Unit, and he's
5   currently a sergeant in the Street Crimes Unit.   He
6   told me that there was suspected heroin on a table
7   in the kitchen.
8        Come to find out, after collecting the
9   evidence, it was actually field-tested positive for
10  cocaine.   The reason it was believed to be heroin
11  is because the crack was actually brown in color.
12  And on the kitchen counter, there was individual
13  packets of cocaine that were wrapped in tin foil;
14  and typically, in my ten years experience, the only
15  time I've ever seen anything packaged in tin foil,
16  it was actually heroin.
17  Q.   Now, based on what was found during the
18  search, was the CS ultimately provided payment for
19  the information?
20  A.   Yes.
21  Q.   Do you know the amount that he was -- he or
22  she was ultimately paid?
23  A.   It was $500.
24  Q.   You had previously mentioned that the average
25  range for tips, in your experience, is between 100

1    and $500?

2    A.   Typically.

3    Q.   Did you have any involvement in the decision

4    of how much the CS was ultimately paid in this

5    case?

6    A.   No, I just would have told his handler, I

7    guess, what, what was recovered from the residence.

8    Q.   During your career in law enforcement, have

9    you ever faced disciplinary action relating to your

10   policing duties?

11        MR. HALL:  Objection, relevance.

12        MS. RITZER:  Your Honor --

13        THE COURT:  What's the relevance?

14        MS. RITZER:  Your Honor, this goes to the

15   second prong, the subjective intent of this

16   officer.  I believe it is entirely relevant that

17   this officer demonstrate -- be allowed to

18   demonstrate that he has a sterling track record and

19   has not been found to have acted improperly by

20   following the procedures that he's described here

21   today.

22        THE COURT:  I'll allow it, and you can argue

23   whether or not it should be considered by the

24   Court.

25        MR. HALL:  Thank you.

1  BY MS. RITZER:

2  Q.  During your career in law enforcement,

3  Detective, have you received any disciplinary

4  action relating to your policing duties?

5  A.  No, I have not.

6  Q.  And when you drafted this affidavit, did you

7  purposefully exclude information that you believed

8  would hurt your chances of receiving a signed

9  warrant?

10  A.  No, I did not.

11  Q.  Did you in any way intend to mislead the judge

12  or trick him into signing this warrant?

13  A.  No, I did not.

14      MS. RITZER:  Nothing further, Your Honor.

15      THE COURT:  Okay.  Thank you.

16      Cross?

17      MR. HALL:  Yes, Your Honor.

18      Your Honor, may I have just one moment?

19      THE COURT:  You may.

20      MR. HALL:  Thank you.

21                    **CROSS-EXAMINATION**

22  BY MR. HALL:

23  Q.  Detective Hesse -- you pronounce your name

24  Hesse, right?

25  A.  Yes.  Correct.

```
 1   Q.   I've been calling you Hesse for weeks, and I
 2   apologize even though you didn't know it.
 3        So, I'm going to quote you here:  A tip has to
 4   be an accurate tip, right?
 5   A.   That's correct.
 6   Q.   For a CS to get paid, a tip has to be an
 7   accurate tip?
 8   A.   Correct.
 9   Q.   And you received a tip from the CS in this
10   case?
11   A.   That's correct.
12   Q.   That there was heroin inside 1112 East Moore,
13   right?
14   A.   That's correct.
15   Q.   And it wasn't that there was a little bit of
16   heroin, right?
17   A.   It was a distribution amount.
18   Q.   So, a lot of heroin, wouldn't it be?
19   A.   It -- I mean, it could be.  It could be the
20   way it was packaged, the amount.  I mean, an ounce
21   could be a distribution amount.
22   Q.   Okay.  An ounce could be a distribution
23   amount.  An ounce was not recovered here, right?
24   A.   Of heroin?
25   Q.   An ounce of heroin, an ounce of anything was
```

1  not recovered in this case, right?

2  A.  That's correct.

3  Q.  Okay.  In fact, it was cocaine, as we heard on

4  direct?

5  A.  Correct.

6  Q.  Right?

7      And with packaging, it was only 9.3 grams; is

8  that about right?

9  A.  Yes, right around there.

10  Q.  And if we remove the packaging, it was closer

11  to about 5 grams, correct?

12  A.  Yes.  I don't have the exact weights right

13  now, but that sounds about right, yes.

14  Q.  Okay.  And you conducted the investigation and

15  executed the search warrant, right?

16  A.  Yes.

17  Q.  So, you saw what was recovered?

18  A.  Yes.

19  Q.  So, it certainly wasn't an ounce?

20  A.  No.

21  Q.  And it definitely was not heroin, right?

22  A.  It had the appearance of, of heroin, yes.

23  Q.  Because of the color?

24  A.  Yes, because it was actually brown in color,

25  the cocaine base was.

1  Q.   Right.  But you've dealt with drugs in your

2  professional capacity for some time, right?

3  A.   Yes.

4  Q.   I mean, you've had experience to see actual

5  heroin, right?

6  A.   Yes.

7  Q.   I would assume different types of heroin?

8  A.   Yes.

9  Q.   Different consistencies of heroin?

10  A.   Yes.

11  Q.   And even if cocaine is brown, it does not have

12  the same consistency of heroin, does it?

13  A.   This was actually the cocaine base that was --

14  that was brown.

15  Q.   The rock-like substance, right?

16  A.   The rock-like substance, yes.

17  Q.   The heroin that you've seen in your experience

18  also has a rock-like substance?

19  A.   There is -- yes, it can be a brown.  In a

20  brown, chunk form.

21  Q.   Now, the heroin you recovered was in tin foil

22  packets, right?

23  A.   We did not recover heroin.

24  Q.   I'm sorry; I misspoke.

25       The cocaine and cocaine base that you

1   recovered was in tin foil packets?

2   A.   There was cocaine in tin foil packets; that's

3   correct.

4   Q.   Okay.  And when you talked to your

5   confidential source, did they tell you that the

6   cocaine and cocaine base -- I'm sorry, heroin --

7   I'm going to keep mixing them up.  I apologize.

8        Did they tell you that the heroin or what they

9   thought was heroin was in tin foil packets?

10  A.   I did not discuss with the CS what it was

11  packaged in.

12  Q.   Did they tell you it was out in plain view?

13  A.   They just said they saw "D" in possession of

14  it inside the house.

15  Q.   Okay.  You didn't ask further questions about

16  how they knew it was a distribution amount?

17  A.   Based on the quantity the CS described is, is

18  how we came to a distribution amount.

19  Q.   What did the CS describe as the quantity?

20  A.   Actually, multiple ounces.

21  Q.   Okay.  And that, of course, wasn't true?

22  A.   I'm not saying that.

23  Q.   Well, multiple ounces were not recovered from

24  the home, right?

25  A.   Yes, but we, as being humans, we don't always

```
 1   find -- I'm not going to say if we do a search
 2   warrant that 1,000 percent of the time we find
 3   everything we're looking for.  There are multiple
 4   occasions where we don't find what we're looking
 5   for in a house, but we do find other evidence.
 6   Q.   Fair to say you and your team are pretty
 7   thorough, right?
 8   A.   We're thorough, yes.  We're also human.
 9   Q.   And it wasn't just you, of course, right?
10   There was a whole bunch of other people, right?
11   A.   That's correct.
12   Q.   Including a special agent from the D.E.A.,
13   right?
14   A.   Yes.
15   Q.   A gentleman by the name of Edson?
16   A.   Yes.
17   Q.   Because you're working with the D.E.A. on this
18   case, right?
19   A.   Not on this case.
20   Q.   But the D.E.A. just showed up?
21   A.   He came over to assist with, with the search
22   warrant and the searching.  It wasn't a Drug
23   Enforcement operation, per se.
24   Q.   Okay.  He just showed up to help out?
25   A.   Yes.
```

1  Q.  And are you aware that he wrote up D.E.A.
2  Form 6 reports related to him showing up and
3  helping out?
4  A.  Yes.
5  Q.  And in each of his reports, are you aware that
6  he referred to you as Task Force Officer Hesse?
7  A.  Yes.
8  Q.  So, the tip has to be accurate or they won't
9  get paid, but you paid the CS in this case $500,
10  right?
11  A.  That's correct.
12  Q.  For ounces of heroin?
13  A.  For what we recovered at the residence.
14  Q.  You talked a bit with Miss Ritzer from the
15  government about kind of your training in drafting
16  affidavits.  Do you recall that?
17  A.  Yes.
18  Q.  And part of the way that you learned to draft
19  affidavits for search warrants is through common
20  experience within your department.  Is that fair?
21  A.  Yes.
22  Q.  You learned from senior detectives?
23  A.  Yes.
24  Q.  You learned from your peers?
25  A.  Yes.

1  Q.  And one of the things that you learned is that

2  to protect a confidential source, you can withhold

3  information from the court, right?

4  A.  That's not correct.

5  Q.  Well, you don't give their criminal history to

6  the court, right?

7  A.  That's correct.  Yes.

8  Q.  Okay.  And you don't disclose to the court

9  whether they're a paid source, correct?

10  A.  That's correct.

11  Q.  If they are a paid source, you certainly don't

12  tell how they're paid, right?

13  A.  What do you mean by "how they're paid"?

14  Q.  Do you ever pay confidential sources with

15  anything other than cash?

16  A.  Oh, no.

17  Q.  You've never given a car to a confidential

18  source or assistance in some other form?

19  A.  Not to my knowledge, other than currency.

20  Q.  But you don't disclose how much they're being

21  paid?

22  A.  That's correct.

23  Q.  And you don't disclose if they're currently

24  receiving assistance for a case based on the

25  accurate tip, right?

1  A.   That's correct.

2  Q.   And this is all part of the common practice of

3  the Decatur Police Department?

4  A.   That's correct.

5  Q.   So, again, you have peers that do this same

6  practice, right?

7  A.   Yes.

8  Q.   You have supervisors that are aware of this

9  practice?

10 A.   Yes.

11 Q.   Who are some of your supervisors that you

12 would say are aware of this practice?

13      MS. RITZER:  Objection, relevance, Your Honor.

14      THE COURT:  What's the relevance?

15      MR. HALL:  Your Honor, I'm inquiring

16 specifically which supervisors are saying that this

17 is a common practice.

18      THE COURT:  No, I know what you're asking, but

19 what's the relevance?

20      MR. HALL:  It goes to knowledge on his part of

21 if this is actually a common practice or if this is

22 a more limited practice with only a handful of

23 officers.

24      THE COURT:  The objection's sustained.  You

25 may ask another question.

1  BY MR. HALL:

2  Q.  So, you stated on direct examination that you

3  have signed -- or filled out, excuse me, hundreds

4  of affidavits for your cases, right, in support of

5  search warrants?

6  A.  It was either that or assisted in.

7  Q.  Okay.  So, you either signed or assisted in

8  the drafting of hundreds of affidavits in support

9  of search warrants?

10  A.  If you take into account search warrants and

11  overhears and other court documents, then the

12  answer would be hundreds.

13  Q.  And in those hundreds of affidavits, if they

14  dealt with confidential informants, you would not

15  have included their criminal history?

16  A.  Correct.

17  Q.  You would not have included whether they were

18  paid, right?

19  A.  Correct.

20  Q.  You would not have included whether they were

21  receiving any benefit in terms of assistance with a

22  case, right?

23  A.  Correct.

24  Q.  And that's because you all choose not to

25  provide that information to the judge, right?

1  A.   Yeah, we believe -- if -- to establish a

2  pattern of reliability with that CS to be able to

3  show the judge that this is a reliable CS we've

4  used in the past, has not provided bad information.

5  Had the CS provided bad information that would be

6  considered a lie, we would not be here getting a

7  search warrant signed in the first place because we

8  wouldn't be using that -- utilizing that CS.

9  Q.   And the government asked you on direct, would

10  there ever be a situation in which you might leave

11  out information.  And correct me if I'm wrong, but

12  your response was that you would leave out

13  information -- I'm sorry -- you would not leave out

14  information that would harm your chance of getting

15  probable cause, right?

16  A.   Correct.

17  Q.   So, you would include things that you felt

18  would help you get probable cause, right?

19  A.   Yes, I would put in there whatever I would be

20  able to get to establish probable cause for that

21  search warrant.

22       However, if there was something that went

23  against me having probable cause, one, I wouldn't

24  draft a search warrant; or, two, that would be in

25  the search warrant or presented to the judge so the

1  judge could decide if there was still probable

2  cause or not.

3  Q.  If it went against you getting probable cause?

4  A.  If it went against me, yes.

5  Q.  Okay.  And you're making that determination?

6  A.  Yes.

7  Q.  Now, in this case, the CI did not appear

8  before the judge?

9  A.  That's correct.

10  Q.  So, the judge couldn't ask the CI questions

11  about his background, right?

12  A.  Not at the time, no.

13  Q.  Was there another time when he could ask him

14  questions about his background?

15  A.  If the judge would ask to have me present the

16  CS to him, I would have.

17  Q.  And when you presented your affidavit to

18  Assistant State's Attorney Pfohl, you didn't

19  volunteer that the CS had a criminal background,

20  right?

21  A.  No, I just wanted to show the pattern of

22  previous reliability with the CS.

23  Q.  You didn't tell Assistant State's Attorney

24  Pfohl that this confidential source was getting

25  paid, right?

1    A.   No.

2    Q.   Talked a little bit about the CS's criminal

3    history on direct examination, and you said

4    something along the lines of at the time you spoke

5    with the CS, you were not aware of any pending

6    cases.

7         Does that sound about right?

8    A.   Yes.

9    Q.   What did you do to confirm that?

10   A.   I knew he was a -- based on, I guess, speaking

11   with the handler, I knew he was a CS in good

12   standing and knew at the time he was accepting

13   money, and he wasn't on probation or parole.

14   Q.   So, you didn't run any sort of independent

15   background check on the CS or anything of that

16   nature?

17   A.   No.

18   Q.   Just to circle back briefly on something, you

19   mentioned that Special Agent Edson simply kind of

20   showed up to help out.

21        When did you let him know that the search

22   warrant was going to be executed?

23   A.   I believe I called him the day before just to

24   tell him I was going to execute a search warrant in

25   the morning.

1    Q.   Okay.  About what time do you think that was?

2    A.   I, I, I couldn't tell you.

3    Q.   Well, do you think it was before you had the

4    search warrant signed by the judge?

5    A.   I couldn't tell you.

6    Q.   You don't know if you had it -- if you made

7    the phone call after the search warrant was signed

8    by the judge?

9    A.   Not almost two years ago, I couldn't tell you

10   what time I told --

11   Q.   But you gave him enough heads-up so he could

12   make sure he was available to be there when it was

13   executed?

14   A.   Yeah.  I just would have told him, "Hey, I'm

15   going to do a search warrant.  If you want to come,

16   you can come," and leave it up to him.

17   Q.   Now, you talked some on direct examination

18   about your continuing education.  Do you recall

19   that?

20   A.   Yes.

21   Q.   So, you had initial training, right?

22   A.   Uh-huh.

23   Q.   You had some continuing education?

24   A.   Yes.

25   Q.   And then when you became a task force officer

1  with the D.E.A., did they require you to do any

2  additional training?

3  A.   No.

4  Q.   Did they ask you any questions about your

5  knowledge of federal law?

6  A.   Not that I can recall, no.

7  Q.   Did they give you any advice on how you should

8  be drafting your search warrant affidavits?

9  A.   No.

10  Q.   Do you have Government's Exhibit 2 in front of

11  you?  It's a copy of the warrant.

12  A.   Yes.

13  Q.   So, I'm going to ask you to look at -- I

14  apologize -- paragraph three.

15      So, when you talked to -- in paragraph three,

16  excuse me, it talks about the background of your CS

17  stating that he or she observed "D" in possession

18  of a distribution amount of heroin.

19      Do you see that?  It's at the end of paragraph

20  three.

21  A.   Yes.

22  Q.   And I know I've already talked a little bit

23  about that initial conversation, but to the best of

24  your knowledge, had the CS ever tried heroin?

25  A.   No, I don't know that.

1   Q.   Okay.   Did you ask them?

2   A.   No, not on that particular conversation.

3   Q.   And they certainly didn't state to you that

4   they tried the heroin in this case, right?

5   A.   Right.   I don't know this, this particular CS

6   to be a heroin user.

7   Q.   Okay.   So, the way they determined it was

8   heroin was just because they saw it, and it looked

9   like heroin?

10  A.   Yes.

11  Q.   I'd like to point you to paragraph six of your

12  affidavit.   Okay.   Correct me if I'm wrong:   First

13  sentence is essentially that the CS only knew

14  Mr. Young as "D."   Is that correct?

15  A.   That's correct.

16  Q.   And tell me if I'm misreading in any way, but

17  the second half of that sentence, "but was able to

18  provide Hesse with a photo of "D."

19  A.   That's correct.

20  Q.   I'm reading that correctly, right?

21  A.   Yes.

22  Q.   Okay.   And you don't have that photo, right?

23  A.   Correct.

24  Q.   It was never a photo that was given to you of

25  "D," right?

1  A.   There was a photo shown to me by the CS.

2  Q.   How was it shown to you?

3  A.   The CS had it on his phone, came to me via

4  text.

5  Q.   So, he texts you a photo on your phone.  Did

6  you maintain that phone?  Do you still have that

7  phone?

8  A.   Yes.

9  Q.   Do you still have those text messages?

10  A.   I would still have the photo, I know.

11  Q.   And that photo is a picture of Mr. Young next

12  to a car, right?

13  A.   He's sitting in a car.

14  Q.   Okay.  And then you took the photo from the

15  phone -- it was texted to you, right?

16  A.   It came, yes, via text.

17  Q.   Okay.  And then you compared it with social

18  media photos, right?

19  A.   Yes.

20  Q.   Now, did the CS ever tell you where he got the

21  photo?

22      MS. RITZER:  Objection, Your Honor.  This is a

23  veiled attempt to determine who the CS is in this

24  case, which is not relevant to Detective Hesse's

25  position in writing this affidavit.

1        THE COURT:  Is the -- I don't know what the
2   answer is so it's a little bit hard for me to rule
3   as to whether or not it would reveal the identity
4   of the CS.
5        MR. HALL:  I'm fairly confident it would not
6   reveal the identity of the CS.
7        THE COURT:  Confer with counsel.
8        MR. HALL:  Absolutely.
9        (A discussion was held off the record.)
10       THE COURT:  Why don't you approach at sidebar?
11       (Proceedings held at sidebar and not
12   transcribed without order of the Court.)
13                       *  *  *  *  *
14       (Whereupon, the following occurred inside the
15   hearing of open court.)
16       THE COURT:  Okay.  The objection is sustained.
17       Please move on.
18   BY MR. HALL:
19   Q.   Now, Detective Hesse, prior to submitting the
20   affidavit to the Court, you stated that you
21   provided it to ASA Pfohl, right?
22   A.   That's correct.
23   Q.   And she offered no questions to you about the
24   affidavit, right?
25   A.   To my recollection, no.

1  Q.   She just reviewed it, correct?

2  A.   Correct.

3  Q.   And then said, "Go ahead," right, or something

4  to that effect?

5  A.   She would have arranged a time with the judge.

6  Q.   And she did arrange a time with the judge,

7  right?

8  A.   Yes, we met with the judge.

9  Q.   That same day, right?

10  A.   Yes, I believe it was the same day I presented

11  the warrant to her.

12       MR. HALL:  Your Honor, may I have just a brief

13  moment?

14       THE COURT:  You may.

15       (Defense counsel and the defendant conferred

16  off the record.)

17  BY MR. HALL:

18  Q.   Agent Hesse, would you consider the

19  information provided by the CS related to

20  distribution amounts of heroin to be providing

21  false information?

22  A.   I'm sorry, can you ask that again?  I'm sorry.

23  Q.   Sure.  So, we talked previously about, you

24  know, if a confidential source provides false

25  information, they will no longer be used as a

1  confidential source, right?

2  A.   False information, yes.

3  Q.   Right.  And so I'm asking, Do you consider the

4  information provided by the confidential source

5  that there were distribution amounts of heroin when

6  there was five or so grams of cocaine to be false

7  information?

8  A.   No.

9  Q.   Okay.

10      MR. HALL:   I have no further questions.

11      THE COURT:   Okay.  Thank you.

12      I just have one question, and then I'll give

13 both sides an opportunity for redirect or any

14 questions based upon the Court's question.

15                      **EXAMINATION**

16 BY THE COURT:

17 Q.   So, it's my understanding that you became a

18 TFO for D.E.A. in March of 2017?

19 A.   Yes.

20 Q.   This search warrant affidavit was prepared on

21 August 31st of 2017?

22 A.   That's correct.

23 Q.   And you did so in your capacity as a

24 detective, correct?

25 A.   With the City of Decatur, yes.

1  Q.  And presumably in advancement of a state court

2  prosecution?

3  A.  Correct.

4  Q.  Okay.  During that period between becoming a

5  TFO or even earlier, up until the preparation of

6  this affidavit, did you assist or participate in

7  the preparation of any federal search warrants with

8  D.E.A.?

9  A.  Not that I can recall drafting, actually

10 drafting a search warrant or anything like that.

11 Q.  Okay.  And had you reviewed any prior to

12 August in your role as a TFO?

13 A.  I honestly can't say.  I'm not sure.  I don't

14 think I did.

15     THE COURT:  Okay.  Thank you.

16     Any redirect or questions based on the Court's

17 questions?

18     MS. RITZER:  No, Your Honor.  Thank you.

19     THE COURT:  All right.  Thank you.

20     Mr. Hall?

21     MR. HALL:  Nothing -- excuse me.  Nothing for

22 the defense.

23     THE COURT:  All right.  Thank you.  You may

24 step down.

25     THE WITNESS:  Thank you.

 1       MS. RITZER:  Your Honor, the government would
 2   like to call ASA Elizabeth Pfohl to the stand.
 3       THE COURT:  Okay.
 4       **(Witness sworn by the clerk.)**
 5                       **ELIZABETH PFOHL,**
 6   **called as a witness, was examined and testified**
 7   **upon her oath as follows:**
 8                    **DIRECT EXAMINATION**
 9   BY MS. RITZER:
10   Q.  Good afternoon, ma'am.
11       Could you please state your name and spell
12   your last name for Madam Court Reporter?
13   A.  Yes.  My name is Elizabeth Pfohl, and it's
14   P-f-o-h-l.
15   Q.  And how are you employed, ma'am?
16   A.  I'm an assistant state's attorney with Macon
17   County.
18   Q.  How long have you been an ASA with Macon?
19   A.  I started in July of 2017, so not quite two
20   years.
21   Q.  Were you employed as an attorney anywhere else
22   prior to that?
23   A.  Yes, I was.  I was an assistant state's
24   attorney in Vermilion County before this.
25   Q.  How long were you at Vermilion County?

1   A.   For approximately two and a half, three years.

2   Q.   Are you a licensed attorney in the state of

3   Illinois?

4   A.   I am.

5   Q.   Now, as a Macon County state's attorney --

6   assistant state's attorney, are you assigned to any

7   specific types of cases or investigations?

8   A.   I am currently the supervisor of the DUI and

9   traffic unit.

10   Q.   And how long have you been in that particular

11   role?

12   A.   I took over when my supervisor went on

13   maternity leave in August of 2018.  When she came

14   back from maternity leave, they moved her to a

15   different position, and I stayed on as the head of

16   the unit starting in November.

17   Q.   And prior to that, what type of cases did you

18   prosecute with Macon County?

19   A.   I've always been in the DUI and traffic unit,

20   so it's been misdemeanor, felony DUIs and felony

21   traffic.

22   Q.   Now, as an ASA, are you asked to assist law

23   enforcement officers in obtaining warrants?

24   A.   Yes, I am.

25   Q.   Does that include search warrants?

1   A.   Yes, it does.

2   Q.   Now, how is it determined which ASA is going

3   to work on a particular warrant?

4   A.   We have an on-call schedule.  It's -- goes by

5   week.  One attorney is assigned; that person is the

6   contact for warrants during the workday.  They also

7   have what we call the warrant phone that they're in

8   charge of for overnight warrants.

9   Q.   And are you included in this on-call rotation?

10  A.   Yes, I am.

11  Q.   And have you been included in that since you

12  began with Macon County in 2017?

13  A.   Yes, I have.

14  Q.   Now, specifically in relation to the search

15  warrants, who drafts the supporting affidavit

16  that's filed in an application for a search

17  warrant?

18  A.   The officers.

19  Q.   And does -- what role then does the ASA have

20  once that affidavit's been drafted?

21  A.   The officer will contact the ASA.  They'll --

22  generally it's the -- they will email over the

23  warrant and the complaints for -- to be reviewed.

24  The ASA will review it to see if there's probable

25  cause and just to make sure every "I" has been

1  dotted, "T" has been checked, so to speak.

2  Q.  And then once the ASA has confirmed that there

3  is probable cause, what happens next?

4  A.  If there are any corrections that need to be

5  made, we send it back to the officer; they send it

6  back to us; we review it again.  And -- or if

7  there's no corrections that need to be made, we get

8  ahold of the judge's chambers to set up a time for

9  the officer to come in for the warrant.

10  Q.  And how do you determine or does a reviewing

11  ASA determine which judge to contact?

12  A.  There's also an on-call list for the judges,

13  which is a weekly schedule.

14  Q.  Now, once a meeting is scheduled before the

15  judge, who would be present at the signing of a

16  search warrant?

17  A.  In Macon County they -- the judges prefer to

18  have the ASA present, although we don't do anything

19  more than having scheduled the meeting, we're done.

20  But we do go with the officer to have the warrant

21  signed.

22  Q.  And under what circumstances would a CS who

23  was involved in the affidavit be present?

24  A.  Generally, if this is a new CS that hasn't

25  been used before, hasn't been shown to be reliable,

1  the officer will bring the CS with them.  They will

2  be sworn in and swear to the testimony that's

3  contained within the affidavit.

4  Q.  Now, who actually signs documents involved in

5  a search warrant?

6  A.  The judge will, the officer or, occasionally,

7  the CS.

8  Q.  Would the reviewing ASA sign or note in any

9  way their presence on the affidavit?

10  A.  On the affidavit, no.

11  Q.  On the search warrant itself?

12  A.  No.

13  Q.  Now, can you estimate the number of search

14  warrants that you've assisted in reviewing during

15  your time with Macon County?

16  A.  It is, I would say, somewhere between 50 to

17  100.  Probably more like 75, 80, but somewhere in

18  that range.

19  Q.  I'm going to direct your attention

20  specifically to August of 2017.  You were employed

21  with Macon County State's Attorney's Office at the

22  time.  Is that accurate?

23  A.  Yes.

24  Q.  And at that time, would you have been included

25  in that on-call schedule to review warrants?

1  A.  Yes.

2      MS. RITZER:  Permission to approach, Your

3  Honor?

4      THE COURT:  You may.

5  BY MS. RITZER:

6  Q.  Handing you what's been previously admitted as

7  Government's Exhibit 2, can you take a look at

8  that?

9      Do you recognize that document?

10  A.  Yes, I do.

11  Q.  What do you recognize it to be?

12  A.  It is a search warrant and a complaint for a

13  search warrant.

14  Q.  Okay.  And is that specifically in regards to

15  an address at 1112 East Moore Street in Decatur,

16  Illinois?

17  A.  Yes, it is.

18  Q.  Can you tell us what date that warrant was

19  signed on?

20  A.  It was signed on August 31st, 2017.

21  Q.  And can you determine who the investigator or

22  the affiant officer in this warrant was?

23  A.  Detective Hesse.

24  Q.  And are you able to tell who the reviewing

25  judge was on that warrant?

1  A.    Judge Forbes.

2  Q.    Now, in your preparation for today's hearing,

3  were you able to determine whether you were the

4  reviewing ASA for that specific search warrant?

5  A.    Yes, I did, and yes, I was.

6  Q.    And did you review the contents of this

7  affidavit and the search warrant in preparation for

8  today's hearing?

9  A.    Yes, I did.

10  Q.    Now, in your review of it, would you agree

11  that the affidavit provides information essentially

12  showing a track record of the CS?

13  A.    Yes, I would.

14  Q.    And would you agree that it does not include

15  the criminal history of the CS?

16  A.    Yes, I would.

17  Q.    Would you also agree that it does not include

18  information about the motivation behind the CS's

19  cooperation in its investigation?

20  A.    Yes, I would.

21  Q.    Did you ask Detective Hesse about the CS's

22  criminal history at the time?

23  A.    To the best of my knowledge, no, I did not.

24  Q.    Did you ask him about the motivation for the

25  CS in participating in this investigation?

1  A.   No.

2  Q.   Did it cause you any concern that that

3  information -- specifically, the criminal history

4  of the CS as well as the motivation guiding his or

5  her participation was not included in that

6  affidavit?

7  A.   No.

8  Q.   Why did that not cause you any concern?

9  A.   From my experience, it's -- someone who is

10  working as a criminal informant is either going to

11  be working off a case or gaining something else,

12  usually monetary in response.  Whether it's one or

13  the other doesn't change what's going on.

14  Q.   In your experience with Macon County State's

15  Attorney's Office, is that information --

16  specifically the CS's criminal history or their

17  motivation for participating, is that regularly

18  included in affidavits?

19  A.   Not in any of the affidavits I've seen.

20  Q.   Now, obviously, it's been some time since you

21  reviewed this.  Do you recall if there was any

22  information that you requested Detective Hesse add

23  to that affidavit that he refused to add?

24  A.   I don't recall asking him to add anything in

25  this case.

1  Q.  Now, once you determine -- or if you were to
2  determine that an affidavit were insufficient in
3  some way or did not -- or needed additional
4  information, would you have agreed or presented the
5  warrant and the affiant officer to a judge?
6  A.  Not until they have made any -- the changes
7  that were necessary.
8  Q.  And in this case, you did present this case to
9  Judge Forbes with Detective Hesse.  Is that
10  accurate?
11  A.  I was present, yes.
12      MS. RITZER:  Nothing further, Your Honor.
13      THE COURT:  Okay.  Thank you.
14      Any cross?
15      MR. HALL:  Briefly.
16                **CROSS-EXAMINATION**
17  BY MR. HALL:
18  Q.  Attorney Pfohl, you stated that you would not
19  produce an affidavit to the judge if there were
20  things that needed to be fixed, right?
21  A.  Yes.
22  Q.  But to the best of your knowledge, you didn't
23  ask Detective Hesse any questions about his
24  affidavit, right?
25  A.  No.

1  Q.  And to the best of your knowledge, he didn't

2  provide you any additional details other than what

3  was on the page, right?

4  A.  Right.

5  Q.  Generally when you're sending affidavits back

6  to be fixed, are those substantive issues involving

7  probable cause, or are they grammar issues and

8  spelling issues?

9  A.  Every once in awhile it is a substantive

10  issue.  Usually it's the spelling or grammar.

11  Q.  Now, unlike other people you may deal with in

12  your career, you, as an attorney, are familiar with

13  the law, right?

14  A.  That -- yes.

15  Q.  And you're familiar with the fact that, you

16  know, motivations are an important thing for the

17  judge to know when evaluating an affidavit, right?

18  A.  They can be, yes.

19      MR. HALL:  No further questions, Your Honor.

20      THE COURT:  Okay.  Thank you.

21      Anything further?

22      MS. RITZER:  No, Your Honor.  Thank you.

23      THE COURT:  I just have one question, and I

24  apologize if Miss Ritzer touched on this with you,

25  but were you aware of this CS's prior felony

1  convictions at the time that you approved the

2  affidavit?

3       THE WITNESS:  I don't believe I was, no.

4       THE COURT:  Okay.  Anything based on that?

5       MS. RITZER:  No, Your Honor.  Thank you.

6       MR. HALL:  No, Your Honor.

7       THE COURT:  Okay.  You may step down.  Thank

8  you.

9       Any further witnesses?

10      MS. RITZER:  We do not, Your Honor.

11      THE COURT:  Okay.  What is the relevance of

12  the other agent's --

13      MR. HALL:  May I have one moment with my

14  client, Your Honor?

15      THE COURT:  You may.

16      (Defense counsel and the defendant conferred

17  off the record.)

18      THE COURT:  We're going to go ahead and take a

19  brief recess for ten minutes.  That will give you

20  time to discuss.  We'll be in recess.

21      (Recess at 3:38 to 3:53 p.m.)

22      THE COURT:  Are there any additional

23  witnesses?

24      MR. HALL:  No, there are not, Your Honor.

25      THE COURT:  Do you need me to weigh in on any

1  -- you were talking about whether or not you wanted

2  the Court's ruling on something regarding the

3  additional witness?

4      MR. HALL:  Oh, yes, I don't think that's going

5  to be necessary.  I think we're not going to call

6  him at all.

7      THE COURT:  Okay.  I'll entertain argument.

8      MR. HALL:  May I make it from the lectern?

9      THE COURT:  Of course.

10     MR. HALL:  Well, as Your Honor knows very

11  well, in *Franks vs. Delaware*, we have the burden of

12  proving by a preponderance of the evidence three

13  different elements.  The first of those is that the

14  affidavit contained material or false statements or

15  omissions.

16     Well, we know at this point that the

17  affidavit, by admission of at least Detective Hesse

18  and it seems all parties are aware --

19     THE COURT:  Hesse.

20     MR. HALL:  Hesse.  I will do it all day long.

21  Sorry.

22     -- that it contained omissions.  Absolutely.

23  It did not have criminal history which, although it

24  has previously been described as minimal, is

25  nothing further from minimal -- could not be

1  further from minimal.  Four felony convictions over
2  the course of 12 years, at least two misdemeanor
3  convictions.  That's a substantial criminal
4  history.  So, that was omitted.
5       The fact that this witness was paid was
6  omitted.  The fact that this witness was paid $500
7  was omitted.  So, there's no argument that there
8  are not omissions here.  We've cleared that burden
9  just by Detective Hesse's --
10       THE COURT:  I don't mean to split hairs here,
11  but wouldn't the argument be the fact that the
12  informant was hoping to be paid would be the
13  omission, since the payment didn't occur until
14  after the search warrant was executed?
15       MR. HALL:  That is true, Your Honor.  Yes.
16       THE COURT:  Okay.
17       MR. HALL:  So, given the timing, you are
18  absolutely correct.  It would be that the informant
19  was motivated by the hope that they would be paid.
20  And as we heard from Assistant State's Attorney
21  Pfohl, motivations can be important to a judge.
22  That is absolutely something -- even independent of
23  the case law -- that I think we all know.
24  Motivations are important to the judge when
25  evaluating whether criminal -- excuse me, a

1  confidential informant is going to be reliable,
2  going to tell the truth.
3       So, we can move to the second factor.  These
4  false statements or omissions were made with
5  deliberate or reckless disregard for the truth.
6       Well, according to Detective Hesse, this is
7  common practice in the Decatur Police Department.
8  This is what they do.  They withhold information
9  from the court because they want to, frankly.
10 They're worried about their confidential
11 informants, and that seems like a very reasonable
12 worry, but the reality is if you put into a search
13 warrant that this person has four felonies, what
14 does that tell anyone?  All that does is tell the
15 judge, "Hey, maybe I need to ask more questions.
16 Maybe I need to have this person present," because,
17 as we also heard, unless it's the confidential
18 informant's first time acting as a CS for the
19 Decatur Police Department, they will not appear in
20 court.
21      So, it's their practice not only to withhold
22 this information from the court but also to not
23 have the CI present in court.
24      And the reason that that's important is
25 because it gives the reviewing judge the neutral --

1   the magistrate that is reviewing whether there's

2   probable cause if there is actually probable cause

3   or if there's something that cuts against it.

4       Instead, what we heard here today, which is

5   the detectives decide what's relevant; the

6   detectives decide what they want to put in or leave

7   out.

8       And, you know, not to disparage Miss Pfohl, it

9   sounds like it's relatively routine in reviewing

10  those warrant applications.  There's not a lot of

11  questions asked; there's not a lot of feedback.

12  She's not pressing for additional details because,

13  more than likely, she trusts the detectives to do

14  what they are supposed to do.  But, of course, we

15  heard that's not what happens, and that's a common

16  practice.

17      So, I know that the government's going to --

18  or I think the government's going to come up here

19  and say, "Well, the issue is not whether it was

20  intentional.  It's whether there was the intent to

21  mislead."  And I think that's a very fine line here

22  because when we think of the intent to mislead, I

23  believe that we're thinking, "I want to trick this

24  judge.  I want them to give me what it is that I

25  want in the search warrant through

1  misrepresentations, through falsities."

2      And what we're seeing here is essentially

3  that.  It may not be as mean-spirited or devious as

4  we think, you know, intentionally misleading would

5  be, but I don't believe that's what's required by

6  the law.  There is intent, and they are certainly

7  attempting to mislead the court by not including

8  this information.

9      And the third issue is whether these false

10  statements or omissions were necessary to a finding

11  of probable cause.  Your Honor has seen the search

12  warrant in this case as has, obviously, the

13  government and myself.  To say that it's light on

14  probable cause is, I think, giving it some credit.

15      We heard from Detective Hesse on the stand.

16  He didn't ask the handler for the CS about the CS's

17  criminal background; or if he did, it was, "I think

18  he was in good standing."  He didn't do any

19  additional checks on his criminal background.  He

20  didn't do any additional checks as to whether there

21  were any cases pending.  He just asked the handler,

22  "Is he in good standing?" and got a yes.  Okay.

23      It's not necessarily within this Court's

24  purview in this issue to look back based on what

25  was found, but look back at what was in the warrant

so I'm not going to sit here and argue that, well,
he was wrong; therefore, we win.  That's not
accurate.

      But the issue is that Detective Hesse doesn't
put anything in his -- Hesse, excuse me -- doesn't
put anything into his affidavit regarding how he
confirmed that there was a distribution amount of
heroin.  I mean, as we heard from Detective Hesse
on the stand, it could be as little as one ounce of
heroin, and it could be distribution amount.  One
ounce.  28 grams is one ounce.  In this case, they
recovered, with packaging, about 9 grams; without
packaging, about 5.  And it certainly wasn't
heroin.  And Detective Hesse likely would have
known that if he had done any corroborative -- any
work on corroborating what his informant had said.

      He looked at a couple pictures.  He checked
some water records.  And if we compare it with the
case law, that falls far short of what is necessary
when you have a similar situation to this in terms
of having the warrant survive when there's been
intentionally misleading statements.

      And one of the cases that's cited by the
government, I think, is actually pretty helpful.
It's *United States vs. Williams*.  If you'll bear

1   with me for a moment, I'll get the cite.  It's

2   actually -- excuse me, it's *United States vs.*

3   *Taylor,* and that's 471 F.3d 832, Seventh Circuit

4   case from 2000.

5        And that was a situation in which Detective

6   John Atteberry of the Bloomington Police Department

7   was proceeding in a similar case.  He was trying to

8   do a drug bust, and he used a confidential source.

9   This one was CS 241.  And he, in his affidavit, did

10  not disclose to the court the fact that there was a

11  criminal history for his confidential source and

12  did not disclose the fact that his source was going

13  to be paid.

14       And the court went through all of the

15  different factors that we're discussing now and

16  ultimately held, "Well, even if we go through our

17  analysis, and even if we say, 'Well, taking that

18  into account, how much probable cause is there

19  otherwise?'" the court found there was sufficient

20  probable cause because Detective Atteberry had done

21  his homework and was very, very thorough.

22       In that case, they were investigating a

23  gentleman by the name of Taylor, and Mr. Taylor had

24  160 pot plants or marijuana plants growing in his

25  back yard, specifically next to a boat, under a

1  tarp, by a six-foot fence.

2      A confidential source for Bloomington Police

3  Department, who had been a source for a long time,

4  came to Detective Atteberry and said, "Detective,

5  this guy Taylor has been growing these plants for

6  about 15 years.  Not only that, but he makes about

7  $500,000 a year on them.  Not only that, but I can

8  give you his height, his weight, his description,

9  his home address.  I'll give you his telephone

10  number.  And he's got 160 of those plants right

11  this moment parked next to" -- "potted next to the

12  parked boat, under a tarp, next to a fence.  But

13  even more than that, here's what I'll do.  I'll

14  make a phone call to Mr. Taylor, and you can listen

15  in.  You can be present for that phone call."

16      And he does that.  And during the phone call,

17  he confirms with Mr. Taylor that those 160

18  marijuana plants are still present.  So -- and

19  that, again, is in the presence of Detective

20  Atteberry.

21      That corroboration, that police work is what

22  saved the warrant, from my perspective, in *United*

23  *States vs. Taylor*.

24      It's a similar situation.  The Bloomington

25  Police Department had a common practice of

1   excluding criminal history and whether they're paid

2   from their affidavits.  And in this case, it worked

3   for them, but only because there was so much

4   corroboration.

5       Unfortunately, in our case, there is not.

6   There were not enough questions asked.  There was

7   not enough corroboration, other than looking at a

8   photo, checking a water bill.

9       So, for our -- from our perspective, we think

10  that we have met the burden of *Franks vs. Delaware*

11  and would ask that the evidence be suppressed.

12      THE COURT:  Thank you.

13      On behalf of the government, Miss Ritzer.

14      MS. RITZER:  Thank you, Your Honor.

15      The affidavit in this case should stand

16  because the defendant has failed to prove by a

17  preponderance of the evidence either prong under

18  *Franks*.

19      As to the first prong -- the materiality prong

20  -- the defendant failed to show that this was, in

21  fact, a material omission; that had the criminal

22  history of the CS as well as his or her motivation

23  been included in the affidavit, that somehow there

24  would not have objectively been probable cause in

25  this case.

1    He relies heavily, in all of his written

2  motions, on *United States v. Glover*, which the

3  Seventh Circuit noted time and time again in that

4  case that there was absolutely no credibility

5  information given about the CS in that case.  There

6  was no track record provided.  There was nothing.

7    And that can be distinguished from the case

8  here because there was credibility information

9  provided by Detective Hesse to the state judge who

10  was reviewing this warrant, specifically that track

11  record that the CS involved in this case was a

12  long-time -- or had been providing accurate

13  information to the Decatur Police Department on at

14  least three prior occasions.

15    And in the case that Defense Counsel cited,

16  *United States v. Taylor*, which, just for purposes

17  of clarity of the record, was a 2006 case, in fact,

18  noted that it was -- that was important

19  information; that track record of a CS is important

20  information that allows a judge to review and

21  evaluate the veracity and credibility of a CS's

22  statements.

23    And that's exactly what Detective Hesse

24  included in the present case.

25    Additionally, a finding under the first prong

1  that there was a material omission essentially
2  requires two presumptions to be made:  First, that
3  judges are somehow naively unaware of these common
4  characteristics that run through CSs -- that they
5  often do have criminal histories, that they're
6  almost always working for some sort of a benefit to
7  themselves.
8      Multiple circuits across the country have
9  noted that, in fact, judges should be presumed to
10 know that.  The Seventh Circuit has stopped just
11 short of saying that but does also note that that
12 is sort of a common theme that judges are aware
13 occur within confidential sources; that they are
14 not these choir boys who have no criminal
15 histories.
16     Additionally, it also requires a presumption
17 that a CS operating for some self-serving motive is
18 somehow going to be less reliable than an
19 individual who's working for no benefits to
20 themselves.
21     Again, almost every circuit that's addressed
22 this -- including the Seventh -- has noted that
23 when an individual is working to either strike a
24 bargain with the police, curry favor with the
25 police, that they're, in fact, more likely to

1  provide accurate information in hopes of either
2  gaining that benefit -- for example, getting the
3  tip money -- and/or being able to continue as a
4  confidential source.
5      Detective Hesse testified that Decatur Police
6  Department has those two rules set up specifically
7  that would demonstrate that the CS was, in fact,
8  likely -- more likely than perhaps someone off the
9  street with no dog in the fight, no benefit to
10  themselves to be providing accurate information.
11      Additionally, the PC in this case is not
12  reliant solely or blindly on the statements of the
13  CS.  Detective Hesse and the investigators within
14  DPD did conduct additional steps to corroborate the
15  information provided to them.  They ran vehicle
16  registration checks; they ran public utility checks
17  to confirm the vehicle that was driven, the
18  ownership of the residence that was to be searched.
19      They also requested the warrant timely, which
20  is a factor that's to be considered by a court in
21  evaluating the probable cause of a warrant.
22      All of these factors strengthen the probable
23  cause such that even had the reviewing judge been
24  aware specifically of the CS's criminal history and
25  his motivation for participating that there would

1   have still been a finding of probable cause in this

2   affidavit.

3        As to the second prong, Your Honor, frankly,

4   the defendant has presented no evidence to suggest

5   that Detective Hesse acted recklessly to mislead

6   the judge beyond just the mere fact that this

7   information was omitted, and that is simply not

8   sufficient.

9        Multiple circuits have noted that it requires

10  more than mere omission or the mere fact of

11  omission to find that an officer acted recklessly

12  to mislead the judge.  And, in fact, that second

13  step -- that it must be done in order to mislead

14  the judge -- was essentially set up as a protection

15  to ensure that courts cannot rely solely on -- or

16  defendants cannot rely solely on the mere fact of

17  an omission to say that an officer acted

18  improperly.

19       And here, improper action just can't really be

20  shown on Detective Hesse's part.  Both he and ASA

21  Pfohl testified that it was common practice within

22  DPD to not include the criminal histories of the

23  CSs or their motivation for participating in an

24  investigation.

25       THE COURT:  Why would the fact that it's a

1  common practice inform my decision as to whether or

2  not, in this particular circumstance, the omission

3  was reckless?

4      MS. RITZER:  Your Honor, I believe in that

5  *Taylor* case, the court notes specifically that that

6  affidavit, in fact, refers to the confidential

7  source as, quote, a concerned citizen.

8      The Seventh Circuit noted that while it's not

9  a great practice and they don't approve it and

10 Bloomington Police Department should change that

11 practice, they noted that that weighs in favor of

12 the officer, that he was not acting improperly

13 because it demonstrated that he was simply

14 following the training, following the pattern of

15 what he had been taught in including that in this

16 affidavit.

17     And I believe the same position applies in the

18 present case.  Detective Hesse -- right or wrong --

19 was trained to not include that information.  The

20 fact that he was following that common practice,

21 the standard procedures within DPD cuts against the

22 fact that he was somehow trying to trick or mislead

23 this judge in the present case.  He was including

24 what he had been taught was relevant and important

25 to include in an affidavit.

1          Now, while the materiality prong is objective
2     whether there was PC or not, the second prong is
3     subjective.  It does matter what Detective Hesse's
4     intent was, what his reasoning was.  And Detective
5     Hesse testified before this Court today clearly,
6     honestly -- or openly that he included the
7     information that he believed was necessary and
8     required under his role as a law enforcement
9     officer.  He took several steps that demonstrate
10    that he had that good intent; specifically, he took
11    steps to corroborate the information that was
12    provided to him.
13         And briefly, Defense Counsel noted in *Taylor*
14    that there were additional steps that that officer
15    in the *Taylor* case had taken to corroborate it.  As
16    noted in our supplemental response, the standard is
17    not whether there were more steps that could have
18    been taken but simply what steps were taken.
19         And Detective Hesse demonstrated that goodwill
20    by taking the steps to corroborate the information
21    that was provided to him.  And more tellingly, he
22    followed the steps that were required under *Leon*,
23    the good-faith exception.  The case law and progeny
24    that follows *Leon* suggests that when an officer
25    decides to even obtain a warrant, that's prima

1   facie evidence that he was acting with good faith.

2       Here, not only did Detective Hesse follow the

3   proper procedures to get a warrant, but he took it

4   to a licensed attorney to approve it prior to

5   taking it to a judge.  He requested that ASA Pfohl

6   review that warrant, and he used her as a conduit

7   in order to get to the judge, demonstrating again

8   that he had the intent to follow the rules, to

9   proceed appropriately in the present case.

10      Detective Hesse's testimony made it clear that

11  he did not act recklessly in drafting this warrant,

12  that he certainly didn't omit information on

13  purpose to mislead the judge, and again, the burden

14  of proof rests on Defense Counsel, and he simply

15  has not met that burden -- or rests on the

16  defendant, and he has not met that burden in the

17  present case for either prong, and so we believe

18  that the affidavit should stand.

19      THE COURT:  I also intend to rule so --

20      MS. RITZER:  Certainly, Your Honor.

21      THE COURT:  -- comprehensively right now, so I

22  want to give both sides an opportunity to make sure

23  that they've been fully heard on the probable cause

24  argument to the affidavit itself, irregardless of

25  the argument of the omission.

 1       MS. RITZER:  Your Honor, we were able to brief
 2   the issues, and I'm sure the Court's well-versed in
 3   our positions based on that.  We would rely on our
 4   written motions unless the Court has any questions.
 5       THE COURT:  Okay.  Thank you.  I don't.  I
 6   just wanted to make sure I didn't catch you
 7   off-guard.
 8       MR. HALL:  We take the same position.  We rely
 9   on our brief.
10       THE COURT:  Okay.  Thank you.
11       MS. RITZER:  Thank you, Your Honor.
12       THE COURT:  Okay.  Thank you.
13       I find this to be a very difficult case for a
14   couple reasons.  First is I find the policy at the
15   police department problematic.  Just to have a
16   blanket policy to not include the prior criminal
17   history, especially when there's a possibility that
18   that could impact, under certain circumstances, a
19   detached and neutral magistrate judge's decision in
20   reviewing an affidavit and determining whether
21   there's probable cause but also to, as a blanket
22   policy, not include any motivation, particularly
23   whether or not they're working off charges or being
24   paid, I find that motivation could be a factor if
25   learned by the reviewing judge for the search

1   warrant, that could influence their decision or
2   color in some ways their finding as to reliability
3   or credibility.
4       So, first I'm going to address -- with that
5   being said, I want to address the *Franks* argument,
6   and then I'll address probable cause challenge in
7   general.
8       So, I find -- I can't do one without also
9   commenting on the other, so I'm sorry if I'm
10  jumping back and forth here and conflating the two
11  concepts.
12      But I find this affidavit to be incredibly
13  thin without even considering the omissions, and
14  I'll get to why in a moment.  But it's because of
15  that that I think that the omissions are -- should
16  be weighed more heavily because of the deficiencies
17  in the affidavit supporting that the magistrate --
18  or the issuing judge, the state court judge finding
19  probable cause.
20      But working through the *Franks* analysis, were
21  these omissions material?  I think there's a strong
22  argument that they were because the entire -- I
23  find that the entire probable cause finding in this
24  search warrant hinged upon the reliability of and
25  the description of the CS's information -- or the

1  description that the CS provided and the
2  reliability of the CS's information.

3      And unlike *Taylor* and other cases, you didn't
4  have all these other details or other supporting
5  reliability information that could kind of offset
6  the impact that -- or lessen the impact that
7  motivation and the prior criminal history might
8  have on the reliability of this CS.

9      I do think, because of that, that the
10 omissions could be considered material, and I do
11 find that for purposes of the *Franks* analysis they
12 are material.

13     The problem that I have is whether or not the
14 defendant has proven by a preponderance that
15 Detective Hesse acted in disregard -- reckless
16 disregard for the truth.  And I feel like I'm, to
17 be candid, between a rock and a hard place on this
18 because I do think that the policy that I've
19 already mentioned that I have issues with is the
20 very thing that prevents me from finding that
21 Detective Hesse acted reckless in this manner.
22 This kind of brings up a little bit of the *Leon*
23 good-faith analysis as well to the extent it's
24 relevant for determining this factor under *Franks*,
25 but I find that it would be difficult for me to

1  make a finding -- first of all, I don't think

2  Detective Hesse acted intentionally to mislead the

3  court.

4      I think the only thing that's a possibility

5  here and the only thing that I'm analyzing is

6  whether or not his actions were reckless, and I

7  find that they were not and that the defendant has

8  not met his burden based on the evidence before the

9  Court that even though these omissions might have

10 been material to the issuing court's ability to

11 make an informed probable cause decision, I think

12 that because of the policy and practice of this

13 department and the training that Detective Hesse

14 received and the fact that he did seek the approval

15 of an attorney before taking it to another attorney

16 -- the issuing judge in this case -- that I cannot,

17 based on that set of facts, find that he acted in a

18 reckless manner.

19     So, turning back to the four corners of the

20 affidavit, I want to go through the appropriate

21 factors in determining whether or not the affidavit

22 is so lacking in probable cause that it is

23 deficient.

24     There's a lot of qualifying information in

25 here that begins in paragraph ten, and so anything

1  from ten on doesn't really support a probable cause

2  finding, so my analysis is focused on one through

3  nine.

4      In paragraph one, this is the only reliability

5  information that's provided, and it's incredibly

6  thin, and I take that into consideration in

7  reviewing the totality of the contents of this

8  affidavit.  Is it the worst I've seen?  No.  But it

9  is boilerplate.  And it's conceded -- to the extent

10  that it's relevant for this portion of the analysis

11  -- by Detective Hesse that that is kind of the

12  standard operating procedure to include this kind

13  of boilerplate reliability information, that the CS

14  has provided information that's deemed reliable on

15  three prior occasions.

16      I think the one thing that kind of saves this

17  a little bit is that they do link it to the fact

18  that this CS has provided information regarding

19  specific narcotic investigations of drug use, and

20  so that, I think, is a little bit more information

21  about this CS's reliability, but it definitely

22  could -- it's not the strongest I've seen.

23      So, now what we have is the information that

24  the CS actually provided and any corroboration that

25  was done for that.

1    So, I think that the -- of the five factors,
2  the timing, the government's right.  The timing
3  bears -- or weighs in favor of probable cause
4  because the affidavit was -- the information
5  contained in the affidavit, at least the date on
6  which the Detective Hesse spoke with the CS and the
7  last date and the only date that's given for the
8  CS's self-disclosure of when he or she was last
9  present at "D's" residence, both of those are very
10  close to the time of the search warrant being
11  obtained and being executed.
12    Where I find the weakness here and where I'm
13  struggling is the level of detail or the lack
14  thereof provided by the CS regarding the drug
15  activity.  And even though the CS claims to have
16  had firsthand -- the ability to have firsthand
17  observations, those observations are so lacking in
18  detail, I'm not sure if the firsthand observation
19  factor really weighs for or against.
20    So, I want to focus about the level of detail,
21  and I think that this is a substantial problem in
22  this affidavit, especially compared with different
23  cases in the Seventh Circuit that have found what
24  has been sufficient.
25    So, here, all we have that links this

1  residence and the defendant to drug trafficking is
2  a statement by a CS, who's minimally been
3  established as reliable, that on three different
4  occasions -- one of which the date was given but
5  the other two are unknown to the issuing judge --
6  that she had reason to be present inside the
7  searched residence, and that on each of those three
8  occasions she observed a black male whom she knows
9  as "D" to be in possession of a distribution amount
10 of heroin.

11      And the only basis for her conclusory
12 statement provided in this affidavit that it was a
13 distribution amount of heroin or that she would
14 even know that it was heroin is this vague comment
15 that she advised during her or his previous life
16 experiences, he or she has had the occasion to be
17 around both users and sellers of heroin and that
18 she advised that the heroin she observed "D" in
19 possession of inside the residence was consistent
20 with the heroin that he or she has observed during
21 previous life experiences.  And that, again,
22 restates the conclusion that it was a distribution
23 amount.

24      I find this to be wholly lacking in detail.
25 There's no information about what it looked like to

 1   allow the judge to make that inference or at least
 2   allow the affiant to provide some insight into
 3   whether or not that would be considered a
 4   distribution amount of heroin.  There's no
 5   information about what it looked like, where it was
 6   located, how it was possessed, really any detail at
 7   all other than this conclusory statement that it's
 8   a distribution amount of heroin.  And how does this
 9   CS know what a distribution amount of heroin is?
10   Because of these ambiguous previous life
11   experiences, and she's had an occasion to be around
12   users and sellers of heroin, which is also lacking
13   -- wholly lacking in any detail.
14        So, that's all you know about drug trafficking
15   or possessing -- the possession of heroin occurring
16   by "D" on -- at that residence.
17        And the only time frame that's offered is
18   contained in paragraph five, which it states that
19   the most recent occasion that the CS had to be
20   inside the residence where she observed this
21   distribution amount of heroin possessed by "D" was
22   between August 27th and August 31st.  We have no
23   idea when the other two occasions were.  And again,
24   there's no additional detail provided for any of
25   the three occasions that are offered in this

1  affidavit.

2       The only corroboration is on collateral

3  matters, which can be sufficient had there been

4  more detail, but the collateral matters here that

5  were corroborated, all they do is link an

6  individual who the police conclude to be "D," and I

7  think that's reasonable, based on the photograph,

8  their investigation and the description of the car

9  -- I'm sorry, the car and their description -- the

10 description of the car and the photograph provided.

11 Detective Hesse was able to conduct independent

12 investigation to verify -- to first identify who

13 resided at that residence and was likely to be "D,"

14 and I think that was reasonable.  And then also to

15 be using the description of the vehicle, the

16 photograph and then the utilities linking -- not

17 only identifying who the defendant was but linking

18 him back to the residence.

19      But that -- all that does is establish who the

20 police believes "D" is and that he lives at that

21 residence.  There's still nothing more that

22 independently corroborates this drug trafficking or

23 the CS's -- I'm sorry, the heroin being possessed

24 by "D."  There's no other information about "D's"

25 involvement in drugs.  And there's no other

1  corroborating information about "D" -- the CS's

2  involvement in drugs and specifically with "D."

3      And so I find, based on those deficiencies,

4  that those are the -- that is the primary factor

5  that needs to be considered here because we have so

6  little else, and I do find that that factor weighs

7  more than any of the other smaller factors, like

8  the timing and the ability to observe firsthand.

9  And I find that, based on those deficiencies, that

10  there -- this affidavit is lacking in probable

11  cause.  And I do find that it is so lacking that a

12  -- well, like I said, I don't find that there's

13  probable cause contained in this affidavit, and the

14  motion to suppress the search is granted.

15      Does either side wish for any further

16  elaboration as to the Court's ruling?

17      MR. MILLER:  Just to be clear, because there

18  would be *Leon*, so the Court is finding not only

19  that there's not probable cause, but it's so

20  lacking --

21      THE COURT:  So lacking.

22      MR. MILLER:  -- in probable cause that the

23  state court judge should not have relied on the

24  warrant.

25      THE COURT:  That is exactly right.  Thank you

1  for that clarification.  I was kind of conflating

2  those two things.

3       So, I do find it's lacking in probable cause,

4  and I do find that the *Leon* exception would be

5  stretched too far to apply to the circumstances in

6  this affidavit and because it is so lacking in

7  probable cause.

8       MR. HALL:  No clarification needed on that.

9       THE COURT:  Is my resolution in this motion

10 dispositive to the case?

11      MS. RITZER:  Your Honor, I will need to speak

12 with my supervisors within the office.  If we could

13 perhaps -- I don't believe that this Court has set

14 another status, but perhaps that might be

15 appropriate at this point?

16      THE COURT:  I think typically your review in

17 seeking permission to -- if you want to -- to file

18 a government appeal would be approximately 30 days

19 absent an extension.  I'm looking at Mr. Miller,

20 but, Miss Ritzer, is that your understanding?

21      MS. RITZER:  I believe that's correct, Your

22 Honor.

23      THE COURT:  Okay.  So, I could set this matter

24 over for further status on May 8th.

25      Does that give the government -- I just ask

1  that you advise the Court at that time how you

2  would like to proceed.

3       MS. RITZER:  Certainly.  That's sufficient

4  time, Your Honor.  Thank you.

5       MR. HALL:  I apologize.  I turned my phone off

6  so I wouldn't have it ringing in your courtroom.

7       May 8th should be fine.

8       THE COURT:  We could do that at 9:15.  We're

9  kind of double-booking on that day so it might not

10 be exactly, but I just ask that we try it at 9:15.

11      Does that work for the government?

12      MS. RITZER:  It does, Your Honor.  Thank you.

13      THE COURT:  Okay.  Thank you.

14      Mr. Hall?

15      MR. HALL:  I apologize, Your Honor.  Give me

16 one moment.

17      THE COURT:  That's okay.

18      MR. HALL:  That will work.  We're talking

19 May 8th, 9:15?  That will work perfectly.

20      THE COURT:  Okay.  Thank you.

21      Is there anything further at this time to come

22 before the Court?

23      MS. RITZER:  No, Your Honor.  Thank you.

24      THE COURT:  Do you wish for me to make Speedy

25 Trial findings at this time, or are you -- I can

1  set a new trial date, or are you satisfied that
2  they're tolled at least until the next hearing?
3      MR. HALL:  Yes, Your Honor, the latter.
4      THE COURT:  All right.  Anything further on
5  behalf of the government?
6      MS. RITZER:  No, Your Honor.  Thank you.
7      THE COURT:  All right.  Anything further on
8  behalf of your client?
9      MR. HALL:  No, Your Honor.
10     We had a couple of other motions that have
11 been held in abeyance, and I'm fine with them
12 continuing to be held until we resolve this issue.
13     THE COURT:  Okay.  Thank you.
14     We'll be adjourned.
15     (Proceedings concluded at 4:27 p.m.)
16
17
18
19
20
21
22
23
24
25

1              <u>CERTIFICATE OF OFFICIAL REPORTER</u>

2

3         I, Jennifer E. Johnson, CSR, RMR, CBC, CRR,
   in and for the United States District Court for the
4  Central District of Illinois, do hereby certify
   that pursuant to Section 753, Title 28, United
5  States Code that the foregoing is a true and
   correct transcript of the stenographically reported
6  proceedings held in the above-entitled matter and
   that the transcript page format is in conformance
7  with the regulations of the Judicial Conference of
   the United States.
8
          Dated this 12th day of April, 2019.
9

10

11                    <u>/s/ Jennifer E. Johnson</u>
                   JENNIFER E. JOHNSON
12                 CSR, RMR, CBC, CRR
                   License #084-003039
13

14

15

16

17

18

19

20

21

22

23

24

25